No. 84-135

IN THE SUPREME COURT OF THE STATE OF MONTANA

1985

STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

JAMES DAVID GOULD,

Defendant and Appellant.

APPEAL FROM: District Court of the First Judicial District,
In and for the County of Lewis & Clark,
The Honorable Thomas Olson, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Robert J. Emmons argued, Great Falls, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Patricia Schaeffer argued, Asst. Atty. General, Helena
Mike McGrath, County Attorney, Helena, Montana

Submitted: March 21, 1985

Decided: July 1, 1985

Filed: JUL 2 1985

*Ethel M. Harrison*

Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

Following a one-car accident, defendant, James David Gould, was charged with negligent homicide and driving under the influence of alcohol. Gould's companion, Dawn Clough, was killed. A Lewis and Clark County District Court jury returned guilty verdicts on both charges. The District Court sentenced Gould to 3 years imprisonment on the negligent homicide charge with all but 6 months county jail time suspended and imposed a $1,000 fine. He received 30 days imprisonment and a $300 fine on the DUI charge. Defendant appeals. We affirm.

The defendant raises the following issues:

1. Did the District Court err in admitting into evidence the defendant's statements that he was driving the vehicle?

2. Did the District Court err in refusing defendant's proposed instruction no. 39, as to whether defendant's admissions were competently given?

3. Did the District Court err in admitting the death certificate which contained a statement that the deceased was a passenger in the vehicle?

4. Were the defendant's admissions corroborated by sufficient independent evidence?

5. Did the District Court err in refusing defendant's proposed instructions no. 33 and 41, relating to the proof required to establish the corpus delicti?

6. Did the District Court err in refusing defendant's proposed instruction no. 11, which in substance required the jury to find beyond a reasonable doubt that defendant was the driver of the vehicle?

7. Did the District Court err in refusing to dismiss the charges at the close of the State's case on the grounds

2

that there was no evidence independent of defendant's admissions to show he was the driver?

8. Did the District Court err in deleting a portion of defendant's proposed instruction no. 14 relating to the use of circumstantial evidence?

9. Did the District Court err in admitting expert testimony regarding defendant's blood alcohol level at the time of the accident?

10. Did the District Court err in allowing evidence of the use of marijuana by the defendant and the decedent on the day of the accident?

11. Are §§ 45-5-104 and 45-2-101(37), MCA, unconstitutionally vague?

12. Did the District Court err in refusing defendant's proposed instructions no. 5, 6, 7, 8, and 38, which instructed the jury in substance that a guilty verdict on negligent homicide required a finding of "conscious" disregard of the risk?

13. Did the District Court adequately instruct the jury that the .10 presumption of intoxication applied only to the DUI charge?

14. Did the District Court err in denying defendant's post-trial motions for a judgment notwithstanding the verdict or a new trial?

Because of the extensive factual arguments, we will set out the facts in some detail. On December 5, 1982, Dawn Marie Clough, 20 years of age, was killed in a single-vehicle accident. The defendant's theory of this case is that Ms. Clough was the driver of the vehicle, which was owned by defendant, and that he was a passenger at the time of the accident. The time and details of various circumstances are

3

contested. We have completed a full review of the transcript, depositions and district court file.

The defendant's testimony indicated the following sequence of events: he had worked the day before the accident. He attended a party which lasted until 2:30 a.m. on the day of the accident. He picked up Ms. Clough at her parents' home in Great Falls around 10:00 a.m. and drove toward Holter Lake, where they planned to go fishing. He drank about five beers between Great Falls and Wolf Creek. They stopped at the Oasis Bar in Wolf Creek, where they stayed about two hours during which the defendant drank two or three Black Velvet ditches. He then drove his pickup to the recreational site at the far end of Holter Lake, where they stayed during the afternoon. That afternoon, he drank about five beers. They left the lake just before dark, which would have been between 5:00 and 6:00 p.m. He drove the 18-mile winding dirt road back to Wolf Creek, where they again visited the Oasis Bar. Defendant may have had three Black Velvet ditches at the bar. (The bartender testified that he served the couple two rounds, but Ms. Clough did not drink hers and the defendant drank all four drinks.) He did not eat any food during the entire day. They stayed more than an hour at the Oasis Bar and, in different testimony, left the bar around 7:00 p.m. Defendant left the bar upset over an argument he had gotten into about a pool game. He drove away from the Oasis Bar, but then pulled over and stopped and turned the driving over to Ms. Clough while he took a nap. He next remembers waking up in the hospital.

While defendant testified that he remembered very few details of the evening, he stated that he was "positive" that he turned the driving over to Ms. Clough. When he left the bar, he was wearing a large parka and a large pair of

4

insulated boots which were laced up and tucked under his pant legs. After the accident, he was found without boots or parka. Defendant contends this evidence shows that he was not driving the vehicle and corroborates his testimony of stopping and taking off his clothing.

Scott O'Connell, the bartender at the Oasis Bar in Wolf Creek, testified as follows: the defendant and Ms. Clough arrived at the bar between 5:00 and 6:00 p.m. The defendant was unable to stand well or to shoot pool very well. O'Connell felt that defendant should not have any more to drink. The defendant became abusive, using foul language and picking fights, and as a result was asked to leave. Several people asked the defendant to let the girl drive. O'Connell himself discussed with the defendant whether he should drive, and the defendant at one point agreed to let Clough drive. The couple went outside, but then came back in to look for defendant's car keys. A bar patron found them under defendant's belt. The defendant got into the driver's seat and drove away toward the entrance to I-15. The accident occurred 8 miles north of Wolf Creek on I-15. The bartender was not able to say specifically what time the couple left the bar.

Jim Adams was at the bar at the same time as defendant and testified unequivocally that the couple left the Oasis Bar at 6:45 or 7:00 p.m. Adams had earlier offered Ms. Clough a ride home to Great Falls if the defendant refused to let her drive.

Robert Sturm, a construction worker who was driving north on I-15 with two co-workers on the evening of December 5, 1982, witnessed the accident. In his rear-view mirror, he saw defendant's pickup erratically approaching from behind, traveling at about 65 to 70 miles per hour. Defendant's

5

pickup passed so close to Sturm's vehicle that Sturm was afraid they would touch. However, Sturm did not see who was driving because it was dark and he was busy driving. After defendant's pickup passed, Sturm saw the vehicle veer to the right as if to take an off ramp although one was not there. The pickup then veered to the left across the northbound lane into the center median, did a somersault and landed in the southbound lane. Sturm did not see the couple thrown from the vehicle. When he and his co-workers ran to the scene, they found the two occupants lying on the road.

Kevin O'Connell was the initial passerby to render first aid. His first aid training consisted of a one-quarter course at Montana State University in 1976. He testified that the defendant was in shock, but came around somewhat after he became warmer.

Jack Shamley, a deputy sheriff stationed at Wolf Creek, was the first law enforcement officer to arrive on the scene. He stated that defendant was not rational at first, but was later able to answer Shamley's questions as to where he did or did not hurt. Shamley testified he thought defendant was in shock, but found no "overwhelming evidence" of shock.

James Tannehill was the first highway patrol officer to arrive at the scene. He received a call at about 7:30 p.m. and arrived 15 minutes later. He determined that Ms. Clough was dead and found the defendant lying on the roadway covered with blankets and coats. Defendant was lying with his head on Ms. Clough's feet, but facing away from her. Tannehill asked the defendant who owned the vehicle. The defendant replied it was his. Tannehill then asked the defendant if he was driving the vehicle. The defendant answered yes. Tannehill testified that these are routine investigative questions asked at the scene of an accident.

6

Highway Patrol Officer Gene Tinsley arrived at the scene shortly after Tannehill. He was directed to stay with the victims while Tannehill conducted the accident investigation. Tinsley was with the defendant continuously for approximately 30 to 35 minutes. During that time, he conversed constantly with the defendant in order to keep the defendant awake. Tinsley asked the defendant whose vehicle it was and who was driving. The defendant replied it was his vehicle and he was driving. Tinsley testified that the defendant seemed able to understand his questions and to respond appropriately. Tinsley testified that he did not believe the defendant's condition impaired his ability to communicate, although he agreed that defendant appeared "a little confused."

Officer Tinsley treated Gould for shock as such accident victims are routinely treated. In Gould's case, Tinsley observed no gross symptoms of shock and found no injuries. Tinsley noted that the defendant was facing away from Ms. Clough and did not change his position before being loaded into the ambulance. Defendant's position is significant because he argues that his lack of competence is demonstrated by the fact that he was lying with his head on Ms. Clough's feet, but was unaware of where she was.

The ambulance arrived at the scene around 8:15 p.m. Donald Fleming, ambulance attendant and certified medical technician, rode with the defendant in the ambulance from the scene to Great Falls and checked his vital signs. When the defendant was initially placed in the ambulance, his blood pressure was 100 and his pulse was 60, which is within the normal range. In order to complete his forms, Fleming asked the defendant who was driving. Fleming phrased the questions in a couple of different ways. The defendant responded consistently that he was driving. Fleming also testified

7

that the defendant's physical condition and neurological responses were good. The defendant had fairly good recall. He was able to answer simple questions such as his name, address and telephone number. About 15 minutes after defendant was placed in the ambulance, his blood pressure was 120 and his pulse was 82. These vital signs remained stable for the rest of the trip, which took about 45 minutes. When they were about 10 minutes from Great Falls, Fleming again asked the defendant who was driving. The defendant said that he was driving and that he never let anyone else drive his pickup. Fleming testified that the interior of the ambulance was heated and that what appeared to have been shock symptoms could have been the result of the defendant lying on cold pavement.

The defendant's competency at the time he made the admissions was disputed in the suppression hearing and at trial. On appeal, defendant emphasizes additional evidence of his condition. This evidence includes defendant's statements that there were three rather than two persons in the vehicle. The defendant picked Clough up at 5:30 p.m. rather than 10 o'clock. Defendant wanted to walk home. The guy who caused the accident better hide out. And everything would be okay if the ambulance attendant gave him a beer. In addition, some of the witnesses characterized the defendant as not responding to questions, unable to converse rationally, mumbling, confused and in a state of shock. The defendant contends he has no recollection of any of these events and that he was too disoriented to legibly write his name on the blood alcohol consent form. Defendant testified at trial that he actually lets other people drive his truck. Counsel emphasizes that none of the witnesses asked defendant, "Were you driving at the time of the accident." Counsel contends

8

the defendant may not have known the question meant at the time of the accident.

The State presented expert testimony through William Newhouse, a forensic scientist from the Department of Justice crime laboratory, on the subject of blood alcohol content measurement and the symptoms associated with various levels. A blood sample taken from the defendant at 9:30 p.m. on the night of the accident showed a blood alcohol content of .29 percent. A sample taken at 9:45 p.m. showed a blood alcohol content of .26 percent. Based upon this evidence and the evidence of the circumstances leading up to the accident, Newhouse testified that a hypothetical person would have had to drink approximately 22 drinks to reach a .26 at 9:45 p.m., and would have had a blood alcohol content of approximately .10 to .11 at around 7:30 p.m. Newhouse indicated that these levels were approximations and that there could be variation among individuals.

Dr. Pfaff, a forensic pathologist, was called as a witness by the defense. He stated unequivocally that it was impossible to calculate the defendant's blood alcohol at the time of the accident. Pfaff did estimate that the average person would have a level of .15 percent under similar circumstances. During cross-examination, Pfaff stated that based upon what he knew about the defendant's condition, defendant was not in shock when he entered the hospital. He stated that defendant's symptoms were probably alcohol-related.

Pfaff also testified regarding an autopsy conducted on Ms. Clough's body. No autopsy was performed until the body was exhumed on motion of defense counsel. Pfaff conducted an autopsy to determine whether any of Ms. Clough's physical injuries tended to indicate whether Clough was the driver or

the passenger in the vehicle. Pfaff's autopsy disclosed no indications whether she was the driver or the passenger. Pfaff also examined the medical records of defendant and concluded they did not disclose any physical injury indicating whether he was the driver or the passenger. The record contains no other physical or direct evidence indicating who the driver was.

On December 29, 1982, defendant was charged by information with negligent homicide for the death of Dawn Clough on December 5, 1982, operating a motor vehicle under the influence of alcohol or drugs, and failing to have liability insurance. The drug-related portion of the DUI charge was later dismissed. The charge of failing to have liability insurance was severed for separate determination.

On January 19, 1983, defendant moved to suppress all evidence of statements made at the scene of the accident on the grounds that he was in shock and not mentally competent to intelligently answer the questions. A suppression hearing was held on August 18, 1983. The hearing included testimony by numerous witnesses and the deposition of Dr. Pfaff. Post-hearing briefs were submitted by both parties. The District Court found by a preponderance of the evidence that defendant's statements were voluntary. The court took into account the totality of the circumstances, including the considerable length of time that defendant was observed by highway patrol officers and emergency medical personnel, and the fact that his statements that he was the driver were consistent throughout. The court denied the motion to suppress.

A jury trial was held before Judge Thomas Olson on September 6 through September 9, 1983. The jury returned verdicts of guilty on both the negligent homicide and

10

operating an automobile under the influence of alcohol charges. Judgment was entered January 26, 1984. Defendant appeals.

I

Did the District Court err in admitting into evidence the defendant's statements that he was driving the vehicle?

The defendant contends that his statements that he was driving the vehicle were not competent, and the District Court erred in admitting them into evidence. The defendant argues that he was in shock and so intoxicated both at the scene of the accident and in the ambulance that he was incapable of making a voluntary statement.

The defendant and the State essentially agree as to legal standards governing the admissibility determination. Section 46-13-301, MCA, in pertinent part provides:

"(1) A defendant may move to suppress as evidence any confession or admission given by him on the ground that it was not voluntary. . . .

. . .

"(4) [T]he prosecution must prove by a preponderance of the evidence that the confession or admission was voluntary.

"(5) The issue of the admissibility of the confession or admission may not be submitted to the jury. If the confession or admission is determined to be admissible, the circumstances surrounding the making of the confession or admission may be submitted to the jury as bearing upon the credibility or the weight to be given to the confession or admission."

The standard to be applied in our review of this issue is whether there is substantial credible evidence to support the District Court's finding. As stated in State v. Grimestad (1979), 183 Mont. 29, 37, 598 P.2d 198, 203:

"Smith and Lenon make it clear that the standard to be applied by the trial judge on a suppression question is 'preponderance of the evidence' but when the same

11

> question comes to us on appeal the credibility of the witnesses and the weight to be given their testimony is for the trial court's determination and our review is limited to determining whether there is substantial credible evidence supporting the District Court's findings."

An admission is competent and admissible where the defendant is found capable of understanding and responding in an intelligent manner. This determination is based upon the totality of the circumstances, which includes consideration of the "defendant's demeanor, coherence, articulateness, his capacity to make full use of his faculties, his memory and his overall intelligence." United States v. Hollis (D.Del. 1975), 387 F.Supp. 213, 220; Annotation, 69 A.L.R.2d 361. The degree of the defendant's intoxication at the time of the admissions does not alone determine the competence or admissibility of an admission. See State v. Emerson (1976), 169 Mont. 285, 546 P.2d 509. Thus, even where the defendant's blood alcohol at the time of the admission is extremely high, the statements are admissible if the evidence shows the defendant was capable of understanding and responding in an intelligent manner. See State v. Chapman (Wash. 1974), 526 P.2d 64 (blood alcohol level .27). Additionally, this Court has previously considered as a relevant factor the trustworthiness of the statements as indicated by the "content of the [statements] or evidence of subsequent events which confirm the reliability of the statements." Emerson, 169 Mont. at 288-89, 546 P.2d at 511.

The suppression hearing testimony as a whole indicates that defendant was lying on the cold pavement and apparently unconscious when help first arrived. Defendant did not respond to questions. Kevin O'Connell and others at the scene covered the defendant with blankets. By the time Deputy Sheriff Shamley arrived, the defendant had begun to

12

warm up and was able to respond to a request to move his feet. While Shamley was with the defendant, the defendant was able to respond to inquiries about where he hurt. After Highway Patrol Officer Tannehill arrived, Tannehill and others placed blankets under the defendant to keep him off the cold ground. O'Connell testified that defendant warmed up and began talking after the blankets were placed under him. Generally, the testimony indicates that defendant became more coherent and aware as he warmed up.

The testimony of the officers at the scene and the ambulance driver who transported defendant to the hospital was that the defendant was coherent and able to carry on a rational conversation. Officer Tannehill did not observe any gross symptoms of shock. He believed the defendant's responses were logical and rational. Officer Tinsley spent 30 to 45 minutes conversing with the defendant and observed that the defendant was able to carry on a normal conversation with no delay in responses. He testified that defendant's responses were clear and understandable. Donald Fleming, the ambulance attendant, testified that the defendant was able to respond to questions regarding his injuries. Fleming also testified that the defendant's blood pressure and pulse were within a normal range, and the defendant responded consistently when asked whether he was driving the vehicle.

While several witnesses testified that defendant may have been in shock, Dr. Pfaff testified that symptoms which could have been perceived as shock by laypersons were more likely alcohol-related. William Newhouse, the State's forensic expert, testified that if a person with a .20 blood alcohol level could recite his name, birth date, residence and other simple data, then the alcohol level had probably not impaired his immediate memory. The ambulance attendant

13

testified that defendant recited his name, birth date and residence in a consistent manner.

In denying defendant's motion to suppress, the District Court stated that it found by a preponderance of the evidence that the defendant's statements were voluntary. The court took into account the totality of the circumstances, including the observations of highway patrol officers and emergency medical personnel. The court noted that defendant's statements that he was the driver of the vehicle were consistent throughout the period leading up to defendant's hospitalization. Our review of the suppression hearing transcript indicates that there was conflicting evidence on this issue and that the trial court resolved this conflict in favor of admissibility of the statements.

We conclude the transcript contains substantial evidence to support the findings and conclusions of the trial court on this issue. We hold the District Court did not err in admitting evidence of defendant's statements that he was driving the vehicle.

II

Did the District Court err in refusing defendant's proposed instruction no. 39 as to whether defendant's admissions were competently given?

Defendant's refused instruction no. 39 stated:

> "Evidence has been admitted concerning a statement allegedly made by the Defendant. Before you consider such statement for any purpose, you must determine that the statement was given competently. In determining whether the statement was competently given, you should consider if the defendant had the capacity to be conscious of the events which occurred at the time of the alleged negligent homicide, whether he could retain those events in his memory, and whether he could recall them with reasonable accuracy."

Under § 46-13-301(5), MCA, the jury is allowed to consider the circumstances surrounding the making of the admission as bearing upon the credibility or weight to be given to the admission. The proposed instruction incorrectly addresses the question of defendant's competence rather than the weight or credibility of the evidence. This inappropriately shifts the issue of admissibility to the jury. In addition, instruction no. 8 instructed the jury as to its role in determining the weight and credibility to be accorded defendant's admissions. It told the jury that it was the exclusive judge whether the statements were true in whole or in part. It also instructed them to view the admissions with caution. In State v. Lapp (Mont. 1983), 658 P.2d 400, 40 St.Rep 120, almost identical instructions were considered. This Court rejected the defendant's contention that an instruction similar to no. 39 should have been given to the jury.

We hold the the District Court did not err in refusing defendant's proposed instruction no. 39.

### III

Did the District Court err in admitting the death certificate which contained a statement that the deceased was a passenger in the vehicle?

The defendant contends that the following portion of the death certificate should have been excised before admission:

> "Decedent was passenger in a pick-up truck which left the roadway and over-turned. She was ejected from the vehicle."

The certificate was admitted during the testimony of the County Coroner who prepared it in the course of his official duties. The death certificate was admissible to prove the death of Ms. Clough under Rule 803(9), M.R.Evid. and § 50-15-109(4), MCA. Admission into evidence for that

15

purpose does not require the admission of the entire death certificate.

The coroner was extensively cross-examined by defense counsel as to the source of the information contained on the death certificate with regard to the decedent being a passenger. The coroner's testimony established that he based the conclusion that Ms. Clough was a passenger upon hearsay statements as to defendant being the driver of the vehicle. No proper foundation was laid for the admission of that part of the death certificate.

We conclude that the statement on the certificate that decedent was a passenger should have been excised prior to admission. While that was not done, we conclude that the failure did not constitute reversible error. The testimony by the bartender and other witnesses established a substantial basis for concluding that decedent was a passenger. While the statement in the death certificate was objectionable, it confirmed in an insignificant way other evidence before the court.

We hold that the District Court did not commit reversible error in admitting the death certificate.

IV

Were the defendant's admissions corroborated by sufficient independent evidence?

The defendant contends that the State must establish the corpus delicti by evidence independent of the admissions on the part of the defendant. The defendant also argues that the bartender's testimony that he saw the defendant driving away from the Wolf Creek Bar shortly before the accident is insufficient because it fails to show that he was driving at the time of the accident. The State argues that the defen-

16

dant's admissions were sufficiently corroborated and that the corpus delicti was established by independent evidence.

Defendant argues that the testimony establishes that the defendant left the bar at 6:00 to 6:15 p.m. This leaves substantial time unaccounted for prior to the accident, which took place at approximately 7:00 p.m. While the evidence is not free of contradiction on the matter of time, the record substantiates findings that the defendant left the bar at 6:45 to 7:00 p.m. The accident happened shortly thereafter, and the first law enforcement officer was contacted at about 7:20 p.m.

Defendant also contends that the evidence regarding placement of his boots and parka is significant to show that he was not driving. That evidence does not in fact appear to be significant. It certainly does not prove conclusively that the defendant turned the driving over to Ms. Clough.

The State contends that § 45-5-111, MCA, is applicable. That statute states:

> "In a homicide trial, before an extraju-
> dicial confession may be admitted into
> evidence, the state must introduce inde-
> pendent evidence tending to establish the
> death and the fact that the death was
> caused by criminal agency." (emphasis
> added)

It is clear from the statute that circumstantial evidence is sufficient for corroboration of a confession.

Section 45-5-111, MCA, was enacted in 1973, with amendments to the somewhat stricter provisions of § 94-2510, R.C.M. 1947. Even under the former statutory standard, this Court has held that the establishment of the corpus delicti need not be proven by independent evidence of itself suffi-cient beyond a reasonable doubt. This Court stated in State v. Ratkovich (1940), 111 Mont. 19, 25, 105 P.2d 679, 682:

17

"There must be some independent evidence establishing the corpus delicti, but it need not of itself be sufficient beyond a reasonable doubt, as, once the independent evidence is given, the confession may be considered with the facts and circumstances in evidence in determining whether the corpus delicti is established. . ." (emphasis added)

The District Court concluded that there was substantial evidence beyond the admissions of the defendant alone. The District Court pointed out that the evidence was to be viewed in a light most favorable to the State. The judge referred to the testimony of bartender O'Connell, who testified as to his observations of defendant's seriously intoxicated state, his discussions with the defendant regarding defendant's inability to drive, and finally his observations that the defendant nonetheless drove the pickup away from the Wolf Creek Bar. With particular regard to driving away from the bar itself, the bartender testified that the defendant first wanted to drive and, after some discussion, agreed to let Ms. Clough drive. Later he changed his mind and insisted that he would drive even though he had told the bartender he would not drive. The bartender saw the defendant drive the pickup away from the bar. An additional witness observed the defendant's truck being driven in a extremely careless and threatening manner.

We hold that the defendant's admissions with regard to driving the vehicle were corroborated by sufficient independent evidence.

V

Did the District Court err in refusing defendant's proposed instructions no. 33 and 41, relating to the proof required to establish the corpus delicti?

18

The discussion regarding corpus delicti in the preceding issue is applicable here. The instructions proposed by the defendant were:

> "You are instructed that there must be independent evidence of the corpus delicit to corroborate an admission, and in a case of Negligent Homicide, as here, such independent evidence must be proven beyond a reasonable doubt." Proposed Instruction No. 33

> "You are instructed that in a case of Negligent Homicide, there must be independent evidence of the corpus delicti and such independent evidence must be proved beyond a reasonable doubt." Proposed Instruction No. 41

These instructions are not correct statements of the law.

As previously mentioned, Ratkovich established that independent evidence need not be sufficient to establish the corpus delicti beyond a reasonable doubt. Both instructions require that independent evidence must be proven beyond a reasonable doubt. The District Court refused the instructions because it concluded that the corpus delicti is not a question to be decided by the jury, but is a threshold question for determination by the court. That is essentially correct as the District Court must first determine if there is sufficient corroborative evidence before ruling on the admissibility of the confession or admission.

We conclude that the District Court did not err in refusing defendant's proposed instructions 33 and 41.

VI

Did the District Court err in refusing defendant's proposed instruction no. 11, which in substance required the jury to find beyond a reasonable doubt that defendant was the driver of the vehicle?

The instruction was repetitive. The jury was adequately instructed on reasonable doubt in other instructions. We

19

hold that no error was committed in refusing defendant's proposed instruction no. 11.

## VII

Did the District Court err in refusing to dismiss the charges at the close of the State's case on grounds that there was no evidence independent of defendant's admissions to show he was the driver?

As discussed at length in IV above, there was substantial evidence independent of defendant's admissions to show that he was driving. No further discussion is required. There clearly was not a factual basis for the dismissal of the charges on this theory at the close of the State's case-in-chief.

## VIII

Did the District Court err in deleting a portion of defendant's proposed instruction no. 14 relating to the use of circumstantial evidence?

The portion of the proposed instruction which the District Court deleted and to which the defendant objects is as follows:

> "However, you are instructed that you are not permitted on circumstantial evidence alone to find the defendant guilty of any crime charged against him unless the proved circumstances not only are consistent with the hypothesis that the defendant is guilty of the crime, but are consistent [sic] with any other rational conclusion."

In State v. Bean (1959), 135 Mont. 135, 337 P.2d 930, this Court determined that the similar proposed instruction was properly rejected. Such instruction is appropriate only where all of the evidence in the case is circumstantial. Here, there is substantial direct evidence. We hold that the District Court did not err in deleting a portion of defendant's proposed instruction no. 14.

20

Did the District Court err in admitting expert testimony regarding defendant's blood alcohol level at the time of the accident?

In substance, the defendant contends that because of the conflict in the evidence between Dr. Pfaff and Dr. Newhouse, Dr. Newhouse was not qualified as an expert to express an estimate of the defendant's blood alcohol level at the time of the accident. The State points out that Dr. Newhouse's opinions were given in response to hypothetical questions as an aid to the jury. The State argues that Newhouse was qualified as an expert and points out that the court instructed the jury during the Newhouse testimony that expert witnesses may give opinions, but the jury is not bound to accept those opinions. In addition, there was substantial cross-examination of Newhouse by defendant's counsel.

As we review the transcript, it appears that both experts were testifying as to hypothetical averages, which would result from drinking a certain amount of alcohol under certain conditions. The hypothetical questions were within the scope of the evidence presented. The court instructed the jury that they could reject an expert's opinion. The District Court did not err in admitting the expert testimony.

X

Did the District Court err in allowing evidence of the use of marijuana by the defendant and the decedent on the day of the accident?

That evidence was admissible because the defendant initially was charged with driving under the influence of alcohol or drugs, even though the drug charge was subsequently dismissed.

In addition, the evidence was properly admitted as a part of the res gestae, as inseparably intertwined in the events leading to the accident. See State v. Trombley (Mont. 1980), 620 P.2d 367, 37 St.Rep. 1871. The defendant has not argued the other crimes rule, but has merely stated that the evidence was prejudicial. We note that after the evidence was admitted, the District Court gave an excellent cautionary instruction, emphasizing that the evidence was only to show the flow of circumstances and that the jury should not conclude defendant was a bad person.

We hold that the admission of the evidence regarding the use of marijuana was not reversible error.

XI

Are §§ 45-5-104 and 45-2-101(37), MCA, unconstitutionally vague?

Defendant contends that the definition of negligence as applied to negligent homicide is unconstitutionally vague. In pertinent part, the code sections provide:

> "Negligent homicide. (1) Criminal homicide constitutes negligent homicide when it is committed negligently." § 45-5-104(1), MCA.

> "'Negligently' -- a person acts negligently with respect to a result or to a circumstance described by a statute defining an offense when he consciously disregards a risk that the result will occur or that the circumstance exists or when he disregards a risk of which he should be aware that the result will occur or that the circumstance exists. The risk must be of such a nature and degree that to disregard it involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation. 'Gross deviation' means a deviation that is considerably greater than lack of ordinary care. Relevant terms such as 'negligent' and 'with negligence' have the same meaning." § 45-2-101(37), MCA (emphasis added).

22

Defendant contends that the definition of negligence as applied to negligent homicide is unconstitutionally vague, relying upon a statement by this Court in State v. Bier (1979), 181 Mont. 27, 32, 591 P.2d 1115, 1118. In Bier, we stated that "although somewhat nebulous in concept, gross negligence is generally considered to fall short of a reckless disregard for consequences and is said to differ from ordinary negligence only in degree, not in kind."

Defendant further argues that the statute is vague because, as applied by the Court, it did not require a conscious deviation from a known risk, and because the statute fails to apprise a person of the standard of conduct required by the statute. Defendant also argues that the standard cannot be a standard determined by a jury, but must be defined by the legislature. Finally, defendant contends that jury instruction no. 15(a) would allow the jury to convict defendant for criminal negligence even though the blood alcohol level was less than .10.

The State contends that the holding by this Court that the tort concept of gross negligence is somewhat nebulous does not in any way support the claim that the statutes are unconstitutionally vague. The State points out that the standard is that the statute must be specific enough to give fair notice of the conduct prohibited and to provide a meaningful differentiation between culpable and innocent conduct. The State points out that it is not unreasonable to leave to the jury the determination of gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

The State also contends that the determination is to be made by the jury taking into consideration the totality of defendant's conduct, including the speed of the vehicle,

23

disregard of warnings that he was too drunk to drive, as well as any evidence of intoxication. In Ketchum v. Ward (W.D.N.Y. 1976), 422 F.Supp. 934, aff'd, 556 F.2d 557 (2d Cir. 1977), the court upheld a negligent homicide statute similar to § 45-5-104(1), MCA. We agree with the holding in Ketchum that the inability of an attorney to predict the outcome of the jury deliberations on the question of negligence is not a sufficient basis for a finding of unconstitutional vagueness. We also adopt the view expressed by the United States Supreme Court in United State v. Ragen (1942), 314 U.S. 513, 523:

> "The mere fact that a penal statute is so framed as to require a jury upon occasion to determine a question of reasonableness is not sufficient to make it too vague to afford a practical guide to permissible conduct."

As we consider the statutes set forth above, we conclude that there is no indefiniteness on the face of the statutes sufficient to require a holding of unconstitutionality. We also conclude that there is no basis for finding the same unconstitutional as applied to present fact circumstances. It is difficult to imagine that conduct, which included drinking both beer and whisky over many hours, disregarding warnings from several people that he was too intoxicated to drive, and then getting behind the wheel of a vehicle and driving down the highway at a speed considerably in excess of the speed limit, could not be classed as a gross deviation, meaning a deviation that is considerably greater than the lack of ordinary care. We conclude that the statutes in question are not unconstitutional.

Defendant argues that instruction no. 15(a) allowed the jury to convict for criminal negligence merely on some degree of intoxication. That is not an accurate statement of the

24

instruction. Instruction no. 15 clearly requires that any intoxication relied upon must constitute a gross deviation from the standard of care as defined in other instructions. As this Court held in State v. Cooke (Mont. 1982), 645 P.2d 1367, 39 St.Rep. 1026, criminal negligence can arise as a result of driving a car while intoxicated. We conclude that instruction no. 15(a) is not improper.

We hold that §§ 45-5-104 and 45-2-201(37), MCA, are not unconstitutionally vague.

## XII

Did the District Court err in refusing defendant's proposed instructions no. 5, 6, 7, 8 and 38, which instructed the jury in substance that a guilty verdict on negligent homicide required a finding of "conscious" disregard of the risk?

Defendant's proposed instructions no. 5 and 38 referred to the necessity of the defendant acting with a mental state as an element of the offense. Such instructions are improper. This Court has previously decided that mental state is not an issue in negligent homicide cases. State v. Kirkaldie (1978), 179 Mont. 283, 587 P.2d 1298. See also, State v. Cook (Mont. 1982), 645 P.2d 1367, 1369, 39 St.Rep. 1026, 1029.

Defendant's proposed instructions no. 6, 7 and 8 related to the term "conscious," as used in the first part of the definition of negligence in § 45-2-101(37), MCA. As to instructions 6 and 7, the District Court concluded that the word "consciously" was a common word in the English language and required no definition. That follows the holdings of this Court that words of common language need not be explained. State v. Camitsch (Mont. 1981), 626 P.2d 1250, 38

25

St.Rep. 563. The District Court did not abuse its discretion in making that determination.

With respect to proposed instruction no. 8, it inserts the word "consciously" where it is not applicable.

We therefore conclude that the trial court did not err in refusing instructions no. 5, 6, 7, 8 and 38.

## XIII

Did the District court adequately instruct the jury that the .10 presumption of intoxication applied only to the DUI charge?

The defendant argues that the instruction should have included a cautionary statement that the presumption that a person is under the influence of alcohol if the blood alcohol content is .10 or greater could not be applied to the negligent homicide charge. Instruction no. 19 referred to the "blood alcohol level of .10" as the phrase is used in Count II, the charge of driving under the influence of alcohol.

The record established that the prosecution did not argue to the jury that the presumption applied in any manner to the negligent homicide charge. The District Court so observed in discussing the same with counsel outside the presence of the jury. There is nothing in the instructions to tie the .10 presumption to the charge of negligent homicide.

It is important to note that the evidence of defendant's intoxication went far beyond that pertaining to his blood alcohol level. There was ample and significant additional evidence of the defendant's intoxication, including defendant's testimony that he was "pretty much intoxicated" at the bar in the evening.

We conclude that the court adequately instructed the jury with regard to the .10 presumption of intoxication.

26

Did the District Court err in denying defendant's post-trial motions for a finding of not guilty or a new trial?

Our discussion of previous issues clearly establishes that in light of the evidence presented, there was no basis for a finding by the judge of not guilty or for the granting of a new trial.

We affirm.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

Mr. Justice John C. Sheehy, dissenting in part and concurring in part:

I would hold that § 45-1-104(1), MCA, which describes the crime of negligent homicide, is unconstitutionally vague, when considered with the definition of "negligently" set out in § 45-2-101(37), MCA.

The statute leaves the determination of criminal conduct to a jury's perception of the standard of conduct that a "reasonable" person would have observed in the actors' situation, and then the jury's perception of what involves a "gross deviation" from that standard. The statutory scheme is too uncertain to be upheld. We may well disapprove of the defendant's conduct on the day in question, but his conviction for criminal negligent homicide is based on formless and indistinct statutes which inadequately describe what constitutes a crime. On their face, the statutes defy containment.

I further disagree with the holding of the majority respecting the instruction on circumstantial evidence. If we regard the statements of the defendant that he was driving as direct evidence (I do not since they are at most admissions), the corroboration for those statements exists only in circumstantial evidence. There is no other direct evidence. To be truly corroborative, the circumstantial evidence should be consistent only with the hypothesis that he was guilty of a crime, and not consistent with any other rational conclusion. The jury should have been so instructed, by the court, if the instruction offered by the defendant was not accurately stated. The majority reliance on State v. Bean, supra, is faulty on two bases: such an instruction was not

28

offered in Bean, and, if Bean is interpreted as the majority interprets it, the holding is incorrect.

Whether the State undertakes to prove the guilt of the defendant by direct evidence, or indirect (circumstantial) evidence, or by a combination of direct and indirect evidence, the facts and circumstances in evidence produced by the State should be consistent with each other and with the guilt of the defendant, and inconsistent with any reasonable theory of the defendant's innocence. That is merely another way of saying that the State must prove its case against the defendant beyond a reasonable doubt.

I have other problems with the majority opinion, but these will suffice. I would reverse the conviction of criminal homicide against the defendant, and sustain his conviction of driving under the influence of intoxicating liquor.

John C. Sheehy
                              Justice

29